Lloyd R. Day (90875)
James R. Batchelder (136347)
Deborah E. Fishman (197584)
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
(408) 873-0110

William J. Robinson (83729)
Victor de Gyarfas (171950)
Uleses C. Henderson, Jr. (225246)
FOLEY & LARDNER LLP
2029 Century Park East Blvd., 35th Floor
Los Angeles, CA 90067
(310) 277-2223

Attorneys for Defendant
SUMTOTAL SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| IPLEARN, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SUMTOTAL SYSTEMS, INC.<br><br>Defendant.<br>─────────────────────<br>And Related Counterclaims. | Case No. C-02-02636 DLJ (BZ)<br><br>**SUMTOTAL SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**<br><br>**DATE: OCTOBER 21, 2005**<br>**TIME: 2:00 PM**<br>**CTRM: 1**<br>**JUDGE: HONORABLE D. LOWELL JENSEN** |

## TABLE OF CONTENTS

PAGE NO.

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ...................................................................................... 3

    A.    The Parties ...................................................................................... 3

    B.    The Asserted Claims of the Patents-At-Issue ..................................... 4

        1.    The Asserted and Implicated Claims of the Patents-at-Issue ................. 4
        2.    IPL Contends that the "Critical Date" for the Patents-at-Issue is July 6, 1997 ................................................................................... 5

    C.    Development of the Accused Aspen LMS Product ............................. 5

III.   LEGAL STANDARD ........................................................................................... 8

    A.    The Summary Judgment Legal Standard ............................................ 8

    B.    The Public-Use and the On-Sale Bar Legal Standards ...................... 8

IV.    INGENIUM ANTICIPATES THE '448, '556 AND '478 PATENT CLAIMS ........................... 10

    A.    Ingenium Contained the Identical Functionality as the Aspen LMS Embodiment for 41 of the 44 Claim Limitations At Issue ................... 10

    B.    Representative Independent Claims Demonstrate The Identity of Function between the Accused Aspen LMS and the Prior Art Ingenium System. ...................................................................................... 11

        1.    Claim 1 of the '448 Patent is Anticipated by the Prior Art Ingenium System. ................................................................. 11

        2.    Claim 53 of the '556 Patent is Anticipated by the Prior Art Ingenium System. ................................................................. 16

        3.    Claim 1 of the '478 Patent is Anticipated by the Prior Art Ingenium System. ................................................................. 20

    C.    Ingenium Performed the Three Remaining Claim Limitations as Required by IPL's Own Claim Construction. .................................... 22

        1.    "searching at least some of the documents to extract more than one documents to be the learning materials" ......................... 22

        2.    "wherein the first computer includes a web server" ............... 23

        3.    "connected to the first computer through a network" ............... 23

D.    Ingenium was On-Sale and in Public Use More than One Year Before the Critical Date of the '448, '556, and '478 Patent Claims............................24

**V.    CONCLUSION** ....................................................................................................**25**

1

**TABLE OF AUTHORITIES**

2

PAGE NO.

3

**Cases**

4

*Allied Colloids Inc. v. Am. Cyanamid Co.*

5

   64 F.3d 1570 ................................................................................................................ 9

6

*Anderson v. Liberty Lobby, Inc.*

7

    477 U.S. 242 ......................................................................................................... 8, 9

8

*Armco v. Cyclops Corp.*

9

   791 F.2d 147 ................................................................................................................ 8

10

*Benedict et al. v. General Motors Corp.*

11

   184 F.Supp.2d 1197 ................................................................................................... 10

12

*Baxter Int'l, Inc. v. Cobe Laboratories Inc.*

13

    88 F.3d 1054 ......................................................................................................... 3, 10

14

*Celotex Corp. v. Catrett*

15

   477 U.S. 317 ............................................................................................................... 8

16

*Egbert v. Lippmann*

17

   104 U.S. 333 ............................................................................................................... 9

18

*Evans Cooling Sys. Inc. v. General Motors Corp.*

19

    125 F.3d 1448 ................................................................................................. 2, 10, 11

20

*Knapp v. Morss,*

21

   150 U.S. 221 ............................................................................................................... 1

22

*Lough v. Brunswick Corp.*

23

   86 F.3d 1113 ............................................................................................................... 9

24

*Manville Sales Corp. v. Paramount Sys., Inc.*

25

   917 F.2d 544 ............................................................................................................... 8

26

*Meyers v. Brooks Shoe Inc.*

27

   912 F.2d 1459 ............................................................................................................. 8

28

*Mossman v. Broderband Software, Inc.*

   51 U.S.P.Q.2d 1752 ................................................................................................ 8

*Netscape Comm. Corp. v. Konrad*

   2001 U.S. Dist. LEXIS 24323 ............................................................................... 9

*Peters v. Active Mfg.,*

   129 U.S. 530 ......................................................................................................... 1

*Pfaff v. Wells Elecs.,*

   124 F.3d 1429 ............................................................................................... 3, 9, 10

*Scaltech Inc v. Retec/Tetra LLC*

   178 F.3d 1378 ................................................................................................. 9, 10

*Tone Bros. v. Sysco Corp.*

   28 F.3d 1192 ......................................................................................................... 8

*Vanmoor v. Wal-Mart*

   201 F. 3d 1363 ............................................................................................... 10, 11

**Statutes**

35 U.S.C. § 102(b) ..................................................................................... 1, 2, 3, 9

## NOTICE OF MOTION, MOTION, AND RELIEF SOUGHT

PLEASE TAKE NOTICE that on October 21, 2005, at 2:00 P.M. in the courtroom of the Honorable D. Lowell Jensen, United States District Court for the Northern District of California, Courtroom 1, 1301 Clay Street, South Tower, Fourth Floor, Oakland, California 94162, defendant and counterclaimant SumTotal Systems, Inc. ("SumTotal") will move and hereby does move this Court for summary judgment against plantiff IpLearn ("IPL") on the grounds that plaintiff's U.S. Patent Nos. 6,126,448 ("the '448 Patent"), 6,398,556 ("the '556 Patent"), and 6,685,478 ("the '478 Patent")(collectively the "patents-at-issue") are invalid for anticipation based on prior public use and the on-sale bar of 35 U.S.C. §102(b).

The anticipating prior art for purposes of this motion is an earlier version of the same product that IPL now accuses of infringement.  Because 41 of 44 unique claim limitations are identically present in the earlier version and because there is no genuine issue of material fact that the earlier version meets the remaining three claim limitations, summary judgment of invalidity is both appropriate and warranted.

This motion is based upon Civil L.R. 7-2 and Civil L.R. 56-1, this Notice of Motion and Motion as well as the attached Appendix A Claim Chart, the accompanying Declarations of A. James Federico and Deborah E. Fishman in Support of Summary Judgment, and all other evidence that may be presented at any hearing on this matter.

## MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

### I.    INTRODUCTION

A maxim dating back to the 1800s recites "that which infringes, if later, anticipates if earlier." *Knapp v. Morss*, 150 U.S. 221 (1893); *Peters v. Active Mfg*., 129 U.S. 530 (1889).  This remains the standard for anticipation today.  The product that IpLearn ("IPL") now accuses of infringement was originally made and sold in this country more than one year before the filing of its applications on the '448, '556, and '478 Patents ("patents-at-issue").  Having accused of infringement that which predates its own patents, IPL now finds itself on the horns of a dilemma: either the patents-at-issue are invalid as anticipated or IPL's infringement case is without basis.

For purposes of this motion, SumTotal assumes that IPL's infringement allegations are correct.[1]  Because that which is accused of infringement was made and sold more than a year before IPL filed for its patents-at-issue, those patents are invalid for anticipation based on public use and the on-sale bar under U.S.C. §102(b).

In 1993, more than five years before IPL filed an application for its patents-at-issue, a small company called Meliora Systems sold the original version of the Aspen product, then called "Ingenium."  Over time, the Ingenium system added features, changed ownership, and even changed its name, but the core functionality present in 1993 is still present in the current accused product.  Here, because the progenitor Ingenium system contained the functionality now accused by IPL of infringement in the successor Aspen product, the Ingenium system anticipates the asserted claims of the patents-at-issue.

At issue in this motion are 27 claims with 44 unique claim limitations (71 limitations altogether).  Forty-one of those 44 claim limitations are identically present in the accused Aspen LMS product and the predecessor Ingenium system.  In that regard, this summary judgment motion for invalidity is unique because one of the most common factual disputes provoked by a motion on invalidity – whether the prior art contains each claim limitation – is virtually eliminated by IPL's own infringement contentions.  SumTotal, for purposes of this motion, also assumes IPL's asserted priority dates for the asserted patents-at-issue.  The only remaining issues for this court to resolve with respect to these 41 limitations are whether the precursor Ingenium system contained the same functionality now accused in the Aspen LMS and, if so, as of what date.

Both of these issues are appropriately resolved on summary judgment.  First, the identity of the accused functionality and the prior art functionality is independently corroborated by contemporaneous business documents created well-before IPL ever filed for its patents-at-issue.  In particular, SumTotal relies on help files that shipped with early versions of the Ingenium product as well as contemporaneous press releases to demonstrate the identity of functionality between the accused Aspen LMS and the prior art Ingenium system.  Second, the determination of whether the

---

[1] SumTotal does not concede infringement and rather is properly pleading in the alternative for purposes of the instant motion.  *See Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000), citing *Evans Cooling Sys. Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997).

Ingenium system was on-sale or in public use before the critical date of IPL's patents is a question of law for the Court. *Pfaff v. Wells Elecs.*, 124 F.3d 1429, 1432 (Fed. Cir. 1997), *aff'd*, 525 U.S. 55 (1998); *Baxter Int'l, Inc. v. Cobe Labs Inc.,* 88 F.3d 1054, 1058 (Fed. Cir. 1986).

Each of the three remaining unique claim limitations implicated by IPL's asserted claims of the patents-at-issue also were present in the Ingenium system, albeit in a way other than that now accused by IPL in the Aspen system.  The three remaining claim limitations are:

(1) "searching at least some of the documents to extract more than one documents (sic) to be the learning materials";

(2) "wherein the materials accessed can be retrieved by at least one of the users from another computer, which is connected to the first computer through a network"; and

(3) "wherein the first computer includes a Web server."

For these limitations, SumTotal applies IPL's own proposed claim construction to show that each function was present in the predecessor Ingenium system.  These issues, too, are ripe for resolution and appropriately resolved on summary judgment.

Resolution of this motion will not be aided by claim construction because, for purposes of this motion, SumTotal has applied IPL's claim construction to demonstrate the identity of functionality between the accused Aspen system and its predecessor, the Ingenium system.  Since there is no genuine issue of material fact that these three claim limitations are met by the predecessor Ingenium system, summary judgment is appropriate.

SumTotal respectfully requests:  (1) summary adjudication that 41 claim limitations were identically present in the Ingenium system; (2) summary adjudication that the three remaining claim limitations were present in the Ingenium system; and (3) summary judgment that the 27 implicated claims of the patents-at-issue are therefore invalid under U.S.C. §102(b).

## II.    STATEMENT OF FACTS

### A.    THE PARTIES

SumTotal Systems, Inc. is a leading provider of learning and business performance technologies, processes, and services.[2]  SumTotal was formed in March 2004 by the merger of

---

[2] *See* Exhibit 1 (SumTotal Systems website) to the Declaration of Deborah E. Fishman submitted in support

industry pioneers, Click2Learn and Docent.[3]  IPL has accused the Aspen system made and sold by

SumTotal's predecessor-in-interest, Click2Learn, of infringing its patents-at-issue.

Click2Learn's primary technology was a learning management software program called the

Aspen Enterprise Productivity Suite, which included the Aspen Learning Management Server

("Aspen LMS").  Click2Learn was originally incorporated as Asymetrix Corporation, but changed

its name in 2001 to Click2Learn.  In May 1998, before the name change, Asymetrix acquired a small

company called Meliora Systems.  Meliora Systems already had developed in 1992 and sold in 1993

a learning management software system called "Ingenium" that formed the basis for Click2Learn's

learning management system, which was first released as part of the Aspen product line in

September 2001.

IPL is an affiliate of IpVenture.  Neither IPL nor IpVenture has ever made or sold any

product.  In fact, IPL's only source of revenue is from licenses taken to its patents in settlement of

litigation.  IPL also has no employees.[4]  Rather, IPL's "team" consists of its two co-founders, Peter

Tong and Doug Thomas, who are both attorneys.[5]

## B.   THE ASSERTED CLAIMS OF THE PATENTS-AT-ISSUE

IPL alleges that SumTotal infringes seven of its patents; three of those seven form the basis

for this motion.  The '448 Patent is directed to computer-aided learning methods for a job, and

claims priority to July 6, 1998.  The '556 Patent claims inexpensive computer-aided learning

methods, and is a continuation-in-part of the application the led to the '448 Patent.  The '478 Patent

is a continuation of the application resulting in the '556 Patent, and is directed to very similar subject

matter as the '556 Patent.

### 1.   The Asserted and Implicated Claims of the Patents-at-Issue

IPL asserts that sixteen claims of the patents-at-issue are infringed by SumTotal's Aspen

LMS product.  Presumably concerned about the validity of its patents-at-issue, IPL chose to assert

---

of SumTotal's Summary Judgment Motion of Invalidity (hereafter "Fishman Decl.").

[3] Id.

[4] See Fishman Decl., Exh. 2 (IpLearn website).

[5] Id.

only dependent claims.  To invalidate those claims, SumTotal must demonstrate invalidity of both the asserted claims and the claims upon which they depend.  As a consequence, there are 27 claims implicated by this present motion.  As set forth below, the 16 asserted claims are underlined; the 10 remaining claims are the implicated claims, with the implicated, non-asserted independent claims shown in bold text:

- '448 Patent, Claims **1**, 2, 3,[6] 13, 16, and 31;

- '556 Patent, Claims **53**, 73, 74, 75, 77, 79, and 80;

- '478 Patent, Claims **1**, 17, 21, 22, 23, 40, **43**, 44, 45, **56**, 59, 67, 71, and 72.

For ease of reference, each of the implicated claims and the corresponding limitations are set forth in the attached Schedule A.

### 2.    IPL Contends that the "Critical Date" for the Patents-at-Issue is July 6, 1997.

One year before the filing of a patent application is referred to as the "critical date" for purposes of measuring the "in public use or on sale" status of prior art.[7]  Since IPL contends that the priority date for the claims of the patents-at-issue is July 6, 1998,[8] the "critical date" for purposes of a prior public use or on-sale bar for the three IpLearn patents-at-issue is July 6, 1997.[9]  Because the accused system was in public use and on-sale before July 6, 1997, each of the three asserted patents-at-issue is invalid.

### C.    DEVELOPMENT OF THE ACCUSED ASPEN LMS PRODUCT

IPL accuses the Aspen Learning Management Server ("Aspen LMS"), standing alone and in combination with other portions of the Aspen Enterprise Productivity Suite, of infringing the patents-at-issue.[10]  IPL asserts that the "Accused Instrumentalities" include every version of the

---

[6] Despite the fact that IPL continues to assert Claim 3 against Click2Learn (*See* Fishman Decl; Exh. 3 (12/14/04 letter from J. Hanft to V. deGyarfas)), IPL did not disclose Claim 3 in its 11/16/04 Infringement Contentions.  For purposes of Claim 3 of the '448 Patent, SumTotal has relied on IPL's Preliminary Infringement Contentions dated 9/1/04.

[7] *In re Epstein*, 31 U.S.P.Q.2d 1817 (Fed. Cir. 1994).

[8] Federico Decl. Exh. J 11/16/04 Pics at 4.

[9] SumTotal has assumed for purposes of this motion IPL's asserted priority date of July 6, 1998 for each of the patents-at-issue.  SumTotal does not waive any argument it may have as to different priority dates for the these patents.

[10] Federico Decl., Exh. J (11/16/04 IPL's Supplemental Disclosure of Asserted Claims and Preliminary

1   Aspen system that "incorporates the features and functionality of this system" as identified in its

2   Preliminary Infringement Contentions.  In particular, IPL contends that the accused products include

3   the Aspen 1.x and 2.x systems sold by Click2Learn on and after 2001.[11]

4         Before there was a SumTotal Systems, or even a company called Click2Learn, a small

5   company called Meliora Systems developed and sold the first version of the Aspen LMS product,

6   called Ingenium.  The timeline below shows the development of the precursor Ingenium system into

7   the now-accused Aspen LMS:



16        In 1992, Meliora Systems consulted for Xerox Corporation to analyze and chronicle the skill

17   set of Xerox's workforce using Microsoft Access as the development tool.[12]  Meliora developed a

18   software program that assessed the skill set of Xerox's employees and compared that skill set to the

19   skills needed for a particular task or job at the company.  In addition to assessing any skill gaps, the

20   software program also could recommend required training to bridge those skill gaps.  Meliora named

21   its consulting project "SkillTrack."[13]

22        In November 1992, Meliora demonstrated its SkillTrack program at Comdex, a widely-

23   attended computer trade show.[14]  Based on widespread enthusiasm for SkillTrack, Gordon Rogers,

---

    Infringement Contentions) at p. 3-4.

[11] *Id.* at 4.

[12] *See* Federico Decl., ¶18.

[13] *Id.*

[14] *See* Federico Decl., ¶19.

1  the founder of Meliora Systems, decided to develop a commercial version of the product, and thus

2  was born Ingenium 1.0.  In the fall of 1993, Meliora shipped Ingenium 1.0, the first commercial

3  version of its electronic learning management software.[15]

4      Ingenium 1.0 was a training management system that enabled organizations to track

5  employee training, certification requirements, and course catalogs to generate reports.[16]  Even in the

6  first commercial release, Ingenium 1.0 allowed users to track students' (or employees') skills as well

7  as their skill requirements (based on that student's job, group or organization, or based on individual

8  decisions by managers) and identified and provided suggested learning materials to fill the skill

9  requirements.[17]

10     Meliora added new functions to the Ingenium system and in the summer of 1994 shipped

11 Ingenium 2.0.[18]  Ingenium 2.0 retained the functionality of Ingenium 1.0, but included additional

12 functionality as well.  In October 1996, Meliora shipped Ingenium 3.0, which included the

13 functionality of Ingenium 1.0 and 2.0.[19]  Three months later, by January of 1997, Meliora

14 introduced a product called Ingenium Messenger, which was an e-mail interface to the Ingenium 3.0

15 system.[20]  Ingenium Messenger included a feature called "Ingenium Page," which created web pages

16 that contained course information and allowed users to view course information, register for courses,

17 and launch courses and documents over the Internet or a corporate intranet via a browser.[21]

18     In May 1998, Asymetrix acquired Meliora Systems and later changed its name to

19 Click2Learn.  Click2Learn continued to market and sell the Ingenium product, but renamed the

20 newest version of its software learning system "Aspen."  Despite this name change, Click2Learn

21 included the core functionality of the Ingenium product in the newly-christened "Aspen" system.

22 IPL accuses the Aspen system, and each version of its release, of infringement.

23

24 [15] *See* Federico Decl., ¶20.
   [16] *See* Federico Decl., ¶21
25 [17] *Id*.
   [18] *See* Federico Decl., ¶24.
26 [19] *See* Federico Decl., ¶27.
   [20] *See* Federico Decl., ¶28.
27 [21] *See* Federico Decl., ¶31.
28

Despite the development of the Ingenium system over time,[22] the functionality that IPL now accuses of infringement existed in the software before July 6, 1997.  IPL cannot have it both ways: if its infringement contentions are accepted as true – the basis of its case against Click2Learn – then IPL's patents are invalid for anticipation.

## III.   LEGAL STANDARD

### A.   THE SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[23]  SumTotal bears the burden of proof to invalidate the patents-at-issue and must show that undisputed facts establish every element of the claim of patent invalidity by clear and convincing evidence.[24]  Once SumTotal meets its "initial burden of demonstrating the absence of any genuine issue of material fact,"[25] the burden then shifts to IPL to "designate specific facts showing that there is a genuine issue for trial."[26]

IPL must do more "than simply show that there is some metaphysical doubt as to the material facts."  Mere denials or conclusory statements are insufficient to create a genuine issue of material fact.[27]  Similarly, a scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the nonmoving party."[28]  Evidence that is merely colorable or is not significantly probative is not sufficient for IpLearn to avoid summary judgment.[29]

### B.   THE PUBLIC-USE AND THE ON-SALE BAR LEGAL STANDARDS

A patent is invalid if "the invention was . . . in public use or on sale in this country, more

---

[22] For anticipation, as for infringement, it does not matter that the anticipatory (or infringing) item contains elements in addition to those specified in the patent claim in question.  *Mossman v. Broderband Software, Inc.,* 51 U.S.P.Q.2d 1752, 1758 (E.D.Mich. 1999).

[23] Fed. R. Civ. P. 56(c).

[24] *Meyers v. Brooks Shoe Inc.,* 912 F.2d 1459 (Fed. Cir. 1990); *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 549 (Fed. Cir. 1990); *Tone Bros. v. Sysco Corp.,* 28 F.3d 1192, 1197 n.4 (Fed. Cir. 1994).

[25] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

[26] *Id.*

[27] *Armco v. Cyclops Corp.,* 791 F.2d 147, 149 (Fed. Cir. 1986).

[28] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[29] *Id.* at 249-50.

than one year prior to the date of the application for patent in the United States."[30]  The invention that triggers the bar must be "an embodiment of the claimed invention," meeting "each of the limitations in the claim."[31]  If such an embodiment was either on sale or in public use before the critical date of one year before application, the patent must be held invalid.

A patent will be held invalid under the on-sale bar of §102(b) if two conditions are satisfied before the critical date:  (1) the invention is "the subject of a commercial offer for sale" and (2) the claimed invention is "ready for patenting."[32]  The "ready for patenting" standard can be satisfied by proof of reduction to practice.[33]

Public use occurs when "a completed invention is used in public, without restriction and in circumstances other than substantially for the purposes of experiment."[34]  The 'public' at issue need not be the general populace: indeed, even one person other than the inventor using the invention can bar patentability.[35]  A finding of public use "depends on how the totality of circumstances of the case comports with the policies underlying the public use bar."[36]  Those policies include ensuring that inventions generally believed to be freely available cannot be removed from the public domain.[37]

The determination of whether an invention was on sale or in public use prior to the critical date are questions of law for the Court.[38]

---

[30] 35 U.S.C. § 102(b).

[31] *Scaltech, Inc. v. Retec/Tetra LLC*, 178 F.3d 1378, 1384 (Fed. Cir. 1999).

[32] *Pfaff v. Wells Elec.*, 525 U.S. 55, 67 (1988).

[33] *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363 (Fed. Cir. 2000), citing *Pfaff v. Wells Elec.*, 525 U.S. at 67.

[34] *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995) (quotation omitted).

[35] *See Egbert v. Lippmann*, 104 U.S. 333 (1881).

[36] *Netscape Comm. Corp. v. Konrad*, 2001 U.S. Dist. LEXIS 24323, at *19 (N.D. Cal. 2001), *aff'd*, 295 F.3d 1315 (Fed. Cir. 2002).

[37] *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1119 (Fed. Cir. 1996).

[38] *Pfaff v. Wells Elecs.*, 124 F.3d 1429, 1432 (Fed. Cir. 1997), *aff'd*, 525 U.S. 55 (1998); *Baxter Int'l, Inc. v. Cobe Laboratories Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1986).

1

## IV.    INGENIUM ANTICIPATES THE '448, '556 AND '478 PATENT CLAIMS

2

### A.    INGENIUM CONTAINED THE IDENTICAL FUNCTIONALITY AS THE ASPEN LMS EMBODIMENT FOR 41 OF THE 44 CLAIM LIMITATIONS AT ISSUE.

3

4      As a threshold matter, the product that triggers anticipation must be "an embodiment of the

5   claimed invention," meeting "each of the limitations in the claim."[39]  Here, the Ingenium system is

6   an early embodiment of the accused Aspen LMS product.  Because the Ingenium system meets 41 of

7   the asserted claim limitations through the same functionality as the accused Aspen LMS, IPL's own

8   Infringement Contentions go a long way to proving anticipation.

9      The Federal Circuit has squarely considered instances where the accused product was the

10   anticipating reference for an on-sale bar and, in each of those cases, affirmed a summary judgment

11   ruling of invalidity.[40]  While the accused infringer bears the burden of proving that the subject of the

12   earlier sale anticipated the asserted patent claims, that burden can be discharged if the subject of the

13   earlier sale is the accused product that forms the basis of the patentee's infringement claim.[41]

14      In *Evans Cooling Systems*,[42] patentee Evans claimed that General Motors infringed its patent

15   by making and selling cars – including the 1992 Corvette – that contained an "LT1 engine cooling

16   system."  The district court granted summary judgment of invalidity based on GM's placing its 1992

17   Corvette with the LT1 cooling system "on sale" before the critical date of the asserted patent.  On

18   appeal, Evans argued that GM failed to meet its burden of proof that the 1992 Corvette anticipated

19   the claims of the asserted patents.  The Federal Circuit disagreed, finding instead that:

20       This is not the typical case where the patentee has placed some device on sale
       prior to the critical date and the accused infringer must demonstrate that this

21       device actually embodied or rendered obvious the patented invention.  ***Here, the
       entire basis of the lawsuit is Evans' – the patentee's – contention that the LT1***

22       ***engine – the device that was put on sale – contains a cooling system that***
       ***infringes…Although GM bore the burden of proving that the LT1 engine***

23       ***embodied the patented invention or rendered it obvious for purposes of the***
       ***summary judgment motion, this burden is met by [patentee's] allegation,***

24       ***forming the sole basis for the complaint, that the LT1 engine infringes***.[43]

---

[39] *Scaltech Inc v. Retec/Tetra LLC*, 178 F.3d 1378, 1384 (Fed. Cir. 1999).

25

[40] *See Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363 (Fed. Cir. 2000) and *Evans Cooling Sys. Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997); *See also Benedict et al. v. General Motors Corp.*, 184 F.Supp.2d 1197 (N.D. Fla. 2002).

26

[41] *Id.*

27   [42] *Evans Cooling Sys. Inc. v. General Motors Corp.,* 125 F.3d 1448, 1451 (Fed. Cir. 1997).

28   [43] *Id.* at 1451, emphasis added.

The Federal Circuit thus affirmed the lower court's grant of summary judgment of invalidity.

Three years later, the Federal Circuit addressed the same issue in *Vanmoor v. Wal-Mart,*[44] and again held that the accused infringer met its burden of proving anticipation by relying on the patentee's allegation of infringement for the same accused product.[45]  The Federal Circuit once again affirmed the lower court's grant of summary judgment of invalidity based on the on-sale bar because the accused product was offered for sale before the critical date of the patented invention.

As in *Evans* and *Vanmoor,* 41 claim limitations at issue here are met by the Ingenium prior art system, the progenitor of the accused Aspen LMS.  While, due to page restrictions, it is not feasible to discuss each of 41 unique claim limitations at length here, SumTotal illustrates the identity of functionality between the accused Aspen system and the Ingenium prior art by performing an element-by-element comparison of one independent claim per patent-at-issue.   For the remainder of the identical limitations, SumTotal refers the Court to the accompanying Declaration of A. James Federico as well as the attached Appendix A, which sets forth each implicated claim limitation, IPL's infringement contentions, and the corresponding functionality of the Ingenium prior art system.

**B.    REPRESENTATIVE INDEPENDENT CLAIMS DEMONSTRATE THE IDENTITY OF FUNCTION BETWEEN THE ACCUSED ASPEN LMS AND THE PRIOR ART INGENIUM SYSTEM.**

**1.    Claim 1 of the '448 Patent is Anticipated by the Prior Art Ingenium System.**

Independent Claim 1 of the '448 Patent provides a representative example of anticipation for the '448 Patent even though it is not asserted since each of the five asserted claims of this patent depend from this unasserted, independent claim.   Claim 1 reads:

| Preamble | A computer-aided learning method for helping a user regarding a job in a company, the method comprising the steps of: |
|---|---|
| 1 | retrieving, by a computer, a job position, which identifies the one or more jobs needed to be done for the job position; and |
| 2 | determining, by the computer, whether learning materials should be presented to the user, with the materials helping the user learn about the one or more jobs; |

[44] *Vanmoor v. Wal-Mart Stores, Inc*., 201 F.3d 1363, 1366 (Fed. Cir. 2000).

[45] *Id.*

| 3 | wherein: the company has a number of documents: |
| 4 | at least some of the learning materials are from the company documents; |
| 5 | at least some of the documents are categorized; |
| | the method further comprises the steps of: |
| 6 | searching at least some of the documents to extract more than one documents to be the learning materials; |
| 7 | and organizing at least some of the extracted documents based on one or more rules to prioritize them. |

Regarding Claim 1's preamble ("A computer-aided learning method for helping a user regarding a job in a company"), IPL alleges that the Aspen LMS is such a method because:

> The Aspen LMS provides benefits including, '[m]ap business goals to departmental and individual objectives', '[a]ssess organizational and employee needs against objectives', '[d]evelop and implement plans to bridge assessed gaps', '[j]ob and organizational skill and competency profiles', and '[d]eliver and manage a blended learning program.' (Aspen LMS, IPL 009)[46]

Just as IPL accuses Aspen, Ingenium 1.0 was a computer-aided learning method that helped a user regarding a job in the company.  Ingenium "will keep track of all of the information related to the skill and training needs for any organization."[47]  More specifically, "Ingenium tracks students and their skills as well as the students' skill requirements.  The students' skill requirements are based on the job they hold, the group or organization they work for, or individual decisions by managers."[48]  Ingenium tracked and compared a student's (employee's) skill requirements (or objectives) to that of the student's job, group, or organization.  Ingenium 1.0 therefore performed this preamble by the same functionality now accused by IPL of infringement in the Aspen LMS.[49]

For Claim 1, limitation 1 ("retrieving, by a computer, a job position, which identifies the one or more jobs needed to be done for the job position"), IPL alleges that the Aspen LMS performs this step because:

> The Aspen LMS provides "[c]ourse and curricula requirements associated with jobs and organizations" and "[j]ob and organizational skill and competency profiles." (Aspen LMS, IPL 009). … The LMS database includes tables for Skills, Competencies, Jobs, Organizations, and Employees (LMSData).[50]

Just as IPL accuses Aspen, Ingenium 1.0 tracked student skills as well as skill requirements.

---

[46] Federico Decl., Exh. J, Exh. A at 22.

[47] Federico Decl., ¶39.

[48] Federico Decl., ¶39.

[49] Federico Decl., ¶40.

[50] Federico Decl., Exh. J, Exh. A at 22-23.

Each job had an associated set of skill requirements that a student had to master.[51]  The skills the student needed to acquire depended on their job, their group or organization, and individual decisions by their managers.[52]  Ingenium 1.0 tracked and compared a student's skill requirements (or "course and curricula requirements") with those required by the student's job and organization. Ingenium 1.0 met limitation 1 by the same functionality now accused by IPL in the Aspen LMS.[53]

Claim 1, limitation 2 requires "determining, by the computer, whether learning materials should be presented to the user, with the materials helping the user learn about the one or more jobs."  IPL alleges that the Aspen LMS does this because:

> The Aspen LMS has "[j]ob and organizational skill and competency profiles," "[f]lexible action-focused skill gap analysis," facilitates the user to "[a]ssess organization and employee needs against objectives, "[d]evelop and implement plans to bridge assessed gaps", "with [c]ourse and curricula requirements associated with jobs and organizations" and has the ability to permit the user to "compare[] ....individual skill sets with job requirements" to "accurately identify the right person for the right job." (Aspen LMS, IPL 009; Aspen Performance Management, IPL 024).[54]

Just as IPL accuses Aspen, Ingenium 1.0 tracked job and organization skills or competencies, as discussed immediately above.  Ingenium 1.0 also developed and implemented plans to bridge the assessed skill gaps through "Class Finder."[55]  Class Finder showed a student's skills gap, showed available classes that could teach those skills, enrolled the student in a selected class session, checked for course pre-requisites, and printed registration confirmation for the student.[56] Ingenium1.0 performed the same functionality now accused by IPL in the Aspen LMS.[57]

Claim 1, limitation 3 recites "wherein the company has a number of documents."  IPL contends that Aspen LMS meets this limitation because "companies by their very nature have many documents."  This allegation applies with equal force to the Ingenium system.[58]

IPL alleges that the Aspen LMS performs Claim 1, limitation 4 ("at least some of the

---

[51] Federico Decl., ¶43.

[52] Id.

[53] Id.

[54] Federico Decl., Exh. J, Exh. A at 23.

[55] Federico Decl., ¶46.

[56] Id.

[57] Id.

[58] Federico Decl., ¶49.

learning materials are from the company documents") because:

> The Aspen LMS provides "[e]asy publishing of any type of document," "[u]ser defined hierarchical catalog with support for both documents and courses," "[u]sage tracking of documents by user", "[s]ecure access to documents." (Aspen LMS, IPL 009).[59]

Just as IPL accuses Aspen, Ingenium1.0 provided a hierarchical catalog that supported courses and their associated documents.  Ingenium 1.0 provided easy publishing of any type of document through a feature called Object Linking and Embedding ("OLE").[60]  OLE is most widely-recognized for the ability to insert a table, chart, or graphic into a Word document.[61]  The OLE feature in Ingenium allowed a user to associate graphics, spreadsheets, and other types of documents with courses, students, skills, jobs, or organizations.[62]  Once uploaded and associated, the documents could be categorized by content type and by media type, among other ways.[63]   Ingenium 1.0 performed limitation 4 by the same functionality IPL accuses of infringement in the Aspen LMS.[64]

Claim 1, limitation 5 recites "at least some of the documents are categorized."  IPL alleges that the Aspen LMS performs this limitation because:

> The Aspen LMS has …'[u]ser defined hierarchical catalog with support for both documents and courses.' (Aspen LMS, IPL 009).  The LMS database schema includes several tables that record data and metadata about content documents (Schema).[65]

Just as IPL accuses Aspen, Ingenium 1.0 enabled users to categorize documents by associating them with courses, as discussed above.  Ingenium offered a variety of ways for cataloging courses and their associated documents.  For example, in Ingenium 1.0, course records could be sorted alphabetically, by vendor, by instructor, by course name, and by media type.[66]  Moreover, "changing the sort on the course records can make viewing the courses easier for the user

---

[59] Federico Decl., Exh. J, Exh. A at 23-24.

[60] Federico Decl., ¶51.

[61] Federico Decl., ¶22.

[62] Federico Decl., ¶51.

[63] Federico Decl., ¶53.

[64] Federico Decl., ¶51.

[65] Federico Decl., Exh. J (11/16/04 IPL's Supplemental Disclosure of Asserted Claims and Preliminary Infringement Contentions) at Exhibit A, p. 24.

[66] Federico Decl., ¶53.

because it groups courses with 'like' information together."[67]  By changing the sort criteria for course records, a user could define the hierarchical catalog of courses that supported both courses and their associated documents.  Ingenium 1.0 performed limitation 5 in the same way now accused by IPL in the Aspen LMS.[68]

Claim 1, limitation 6 ("searching at least some of the documents to extract more than one documents to be the learning materials") is met by the Ingenium system, albeit in a different way than is currently accused by IPL in the Aspen LMS, as discussed in Section IV.C.1., below.

Finally, IPL alleges that the Aspen LMS performs Claim 1, limitation 7 ("organizing at least some of the extracted documents based on one or more rules to prioritize them") because:

> The Aspen LMS can '[o]btain usage information on knowledge documents to iteratively improve the content and organization of documents for overall effectiveness' and '[d]ynamically created study plans.' (Aspen Information Management, IPL 037).

> Prioritization is also found in the Aspen LMS's claims of '[p]ost-assessments with suggested remediation', '[a]daptive learning based on learning tracks and pre-testing', '[a]nalytics to verify performance improvement and identify success patterns', '[a]nalysis of assessment results with rich reports', '[p]rescriptive learning', '[v]alidation and optional enforcement of prerequisite requirements', and '[p]ersonalized rule-based feedback.' (Aspen LMS, IPL 009).[69]

In other words:

> In the Aspen LMS, skill gaps are prioritized (LMSDS2, screen example on page 1) and skills are associated with courses that can close these gaps. Aspen LMS offers 'Flexible action focused skill-gap analysis' and 'Support for association of skills with courses' (Aspen LMS, IPL 009).[70]

Just as IPL accuses Aspen, Ingenium 2.0 added a feature called "skill prioritization," which allowed a user to organize or sort through the skills needed by the student or employee, ranked by priority.[71]  Because Ingenium 2.0 included the ability to link documents to courses and skills, prioritization of skills resulted in a prioritization of documents associated with those skills.[72]

Ingenium 2.0 had a feature called "Skill Priority Pulldown List," located on both the Job

---

[67] *Id.*

[68] *Id.*

[69] Federico Decl., Exh. J, Exh. A at 25.

[70] *Id.* at Exhibit A, at 26.

[71] *See* Federico Decl., ¶25.

[72] *Id.*

SUMTOTAL'S NOTICE OF MOT AND MOT
FOR SUMMARY JUDGMENT OF INVALIDITY            15            CASE NO. C-02-02636 DLJ (BZ)

Form and Organization Form, where users could see the priority ranking of various skills by a job or by an organization.[73]   Ingenium also associated skills with courses that could close those gaps using the "Class Finder" feature.[74]   Ingenium 2.0 thus performed limitation 7 in precisely the same way that is now accused by IPL in the Aspen LMS.[75]

### 2.   Claim 53 of the '556 Patent is Anticipated by the Prior Art Ingenium System.

Claim 53 of the '556 Patent also provides a representative example of anticipation since the four asserted claims (seven implicated claims total) of the '556 patent each depend from this unasserted, independent claim.   Claim 53 recites:

| Preamble | A computer-aided learning method for a user comprising the steps of: |
|---|---|
| 1 | retrieving, by a first computer, materials related to the user; |
| 2 | permitting, by the computer, the user access materials regarding at least one learning user if the user is an institute user, as determined based on an identifier of the user; |
| 3 | wherein if the user is the institute user, the institute user can learn about the at least one learning user in an area the institute user is interested; |
| 4 | wherein the materials accessed can be retrieved by at least one of the users from another computer, which is connected to the first computer through a network; |
| 5 | wherein the institute user pays so that materials can be accessed; |
| 6 | wherein a learning user is allowed to access materials to learn; |
| 7 | wherein materials on at least one of the users can be monitored and updated; and |
| 8 | wherein the first computer includes a Web server. |

The preamble of Claim 53 recites "A computer-aided learning method for a user," which is similar to the preamble in Claim 1 of the '448 Patent above.  Just as IPL now accuses Aspen, Ingenium 1.0 was a computer-aided learning method for a user.[76]

Claim 53, limitation 1 requires "retrieving, by a first computer, materials related to the user." IPL alleges that the Aspen LMS performs this limitation because:

> The Aspen LMS stores and retrieves materials about the user as indicated by these capabilities: "Personalized home page", "Advanced registration capabilities", "Learner progress tracking through training requirements", "Granular attendance tracking", "skill gap analysis", "learner and manager-driven development plans",

---

[73] See Federico Decl., ¶61.

[74] Id.

[75] Id.

[76] See Federico Decl., ¶75.

SUMTOTAL'S NOTICE OF MOT AND MOT
FOR SUMMARY JUDGMENT OF INVALIDITY                16                CASE NO. C-02-02636 DLJ (BZ)

"completion tracking of development plans", and "competency assessments" (Aspen LMS, IPL 009).[77]

Just as IPL accuses Aspen, Ingenium 1.0 retrieved via a computer materials related to the user including the student's learner progress, attendance tracking, and skill gap analysis: "Ingenium tracks students and their skills as well as the students' skill requirements."[78]   Ingenium thus performed limitation 1 in precisely the same way that is now accused by IPL in the Aspen LMS.[79]

IPL alleges that the Aspen LMS performs claim limitation 2 ( "permitting, by the computer, the user access materials regarding at least one learning user if the user is an institute user, as determined based on an identifier of the user" ) because:

> The Aspen LMS has "SSL Secured login included at no charge, including the `digital certificate'," "[r]ole-based Security" and "[u]sage tracking of documents by user.  Secure access to documents" for access by a user, who then has access to features such as "[j]ob and organizational skill and competency profiles," "[f]lexible action-focused skill gap analysis," which permits the user to "[a]ssess organization and employee needs against objectives," "[d]evelop and implement plans to bridge assessed gaps," and has the ability to permit the user to "compare[] .... individual skill sets with job requirements" to "accurately identify the right person for the right job." (Aspen LMS, IPL 009; Aspen Performance Management, IPL 024; Aspen Hosting, IPL 019).[80]

Just as IPL accuses Aspen, Ingenium 2.0 had role-based security where, based on an individual's role, an administrator could create record-level security (by document) by assigning user IDs and passwords to individual users.[81]  With the appropriate user identification, an Ingenium user could access materials about a learning user (employee or "student") including:  average grade for a course, total training costs per student or organization, students having a particular skill, and more.[82]  This is the same functionality that IPL accuses in the Aspen LMS.[83]

Claim 53, limitation 3 requires that, "if the user is the institute user, the institute user can

---

[77] Federico Decl., Exh. J (11/16/04 IPL's Supplemental Disclosure of Asserted Claims and Preliminary Infringement Contentions) at Exhibit A, p. 30.

[78] *See* Federico Decl., ¶79.

[79] *Id.*

[80] Federico Decl., Exh. J, Exh. A at 31.

[81] Federico Decl., ¶82.

[82] *Id.*

[83] Federico Decl., ¶82.

learn about the at least one learning user in an area the institute user is interested."  IPL alleges that the Aspen LMS performs this limitation because:

> With Aspen you have a complete understanding of the skills and knowledge of your workforce and are able to align your workforce to optimize productivity. Using individual and 360° Assessments, Skill Gap Analysis, and a Qualified Employee Finder, you are able to identify the right people for the right job, analyze the current skill sets against business needs, and put together development plans for continued performance improvement. In addition, Aspen gives you access to all of the information you need to effectively create needed learning plans to fulfill knowledge gaps" (LMSDS2, page 1).[84]

Just as IPL accuses Aspen, Ingenium 1.0 tracked skills and provided skill gap assessments for a company's employees, as discussed above.  In addition, Ingenium 1.0 provided the ability to identify qualified employees based on their acquired skill set:  "When the subform section of the Skill Form is set to show the students having the skill, the user can see all the students who have acquired the skill."[85]  Finally, Ingenium performed this limitation in the same way that IPL now accuses Aspen of infringing because, based on the skill gap analysis, Ingenium's "Class Finder" feature provided access to a learning plan (or class) to fill the skills gap.[86]

Claim 53, limitation 4 ("wherein the materials accessed can be retrieved by at least one of the users from another computer, which is connected to the first computer through a network") is met by the Ingenium system, albeit in a different way than is currently accused by IPL, as discussed below in Section IV.C.3.

IPL alleges that the Aspen LMS performs limitation 5 ("wherein the institute user pays so that materials can be accessed") because: "Aspen can be licensed on a perpetual or subscription basis" and "the Aspen LMS is 'generally licensed based on the number of individual named users.'"[87]  Since its first commercial release, Ingenium was licensed to customers based, generally, on the number of individual users.[88]  Ingenium 1.0 performed limitation 5 in the same way that is

---

[84] Federico Decl., Exh. J, Exh. A at 31-32.

[85] Federico Decl., ¶85.

[86] *Id*.

[87] Federico Decl., Exh. J, Exh. A at 33.

[88] *See* Federico Decl., ¶95.

now accused by IPL in the Aspen LMS.[89]

IPL alleges that the Aspen LMS performs limitation 6 ("wherein a learning user is allowed to access materials to learn") because:

> The Aspen LMS can provide access to and track the following content types: AICC, Centra, Generic, LearnLinc, Macromedia Authorware, Macromedia CourseBuilder, Netg BPDL SimBuilder 2000, NETg SkillBuilder/SimBuilder 2001, Perception QuestionMark, Proprietary API, SCORM, SkillSoft, SmartForce, and ToolBook (CBTSupport).[90]

In other words, IPL contends that the Aspen LMS meets this claim limitation because the system provides access to third-party learning content. Just as IPL now accuses Aspen, Ingenium provided access to third party content and even provided access to some of the same third-party content named by IPL, including Netg and Skillsoft.[91]

Claim 53, limitation 7 requires "wherein materials on at least one of the users can be monitored and updated." IPL alleges that the Aspen LMS performs limitation 7 because:

> The Aspen LMS stores, updates, and retrieves materials about the user as indicated by these capabilities: "Personalized home page", "Advanced registration capabilities", "Learner progress tracking through training requirements", "Granular attendance tracking", "skill gap analysis", "learner and manager-driven development plans", "completion tracking of development plans", and "competency assessments" (Aspen LMS, IPL 009).[92]

Just as IPL accuses Aspen, Ingenium 1.0 stored, updated, and retrieved materials about a user ("student") including a student's acquired skills, completed class sessions, and grades in courses.[93] Ingenium 1.0 met this claim limitation in the same way IPL now accuses the Aspen LMS.[94]

Finally, Claim 53 limitation 8 ("wherein the first computer includes a Web server") is met by the Ingenium system, albeit in a way other than is currently accused by IPL in the Aspen LMS. Please see Section IV.C.2. below for a discussion of this claim limitation.

---

[89] *See* Federico Decl., ¶98.

[90] Federico Decl., Exh. J, Exh. A at 33.

[91] *See* Federico Decl., ¶102.

[92] Federico Decl., Exh. J, Exh. 34 at 34.

[93] Federico Decl., ¶105.

[94] *Id.*

### 3.   Claim 1 of the '478 Patent is Anticipated by the Prior Art Ingenium System.

Three asserted claims (six implicated claims total) depend from unasserted, independent Claim 1 of the '478 Patent.  Claim 1 of the '478 Patent is strikingly similar to Claim 53 of the '556 Patent discussed above and, in fact, only introduces two unique claim limitations, shown below as limitations 6 and 9:

| Preamble | A computer-aided learning method for a user comprising the steps of: |
|---|---|
| 1 | retrieving, by a first computer, materials related to the user; |
| 2 | permitting, by the computer, the user access materials regarding at least one learning user if the user is an institute user, as determined based on an identifier of the user; |
| 3 | to allow the institute user to learn about the at least one learning user in an area the institute user is interested; |
| 4 | permitting a learning user to access materials for learning; |
| 5 | monitoring at least one of the users, and updating materials on the user based on the monitoring; and |
| 6 | becoming aware of a learning user's understanding in an area, |
| 7 | wherein the materials accessed can be retrieved by at least one of the users from another computer, which can be connected to the first computer through a network, |
| 8 | wherein the institute user is charged, wherein based on the charging, a learning user is allowed to access materials for learning, and the institute user is allowed to access materials regarding the at least one learning user, and |
| 9 | wherein an instructor-led course that allows a learning user to learn as an instructor teaches can be identified for a learning user in view of a need of the learning user. |

The preamble and claim limitations 2 and 3 of Claim 1 of the '478 Patent are identical to the preamble and claim limitations 2 and 3 of Claim 53 of the '556 Patent, discussed above.  Claim limitations 4, 5, 7 and 8 of claim 1 of the '478 Patent are substantially the same as limitations 6, 7, 4 and 5 respectively of the '556 Patent, and each is met by the Ingenium system.

Claim 1, limitation 6 recites "becoming aware of a learning user's understanding in an area." IPL alleges that the Aspen LMS performs this limitation because:

> In the Aspen LMS, skill gaps are and skills are associated with courses that can close these gaps. Aspen LMS offers "Flexible action-focused skill-gap analysis" (Aspen LMS, IPL 009). Skill gaps are displayed in Aspen LMS (LMSDS2, screen example on page 1).

> The Aspen LMS has "[a]daptive learning based on learning tracks, and pre testing," "[dynamically created study plans] and "[p]ost-assessments with

20

198919_4

suggested remediation." (Aspen LMS, IPL 009)."[95]

Just as IPL accuses Aspen, Ingenium assessed skill gaps and associated those gaps with courses or classes that fill those gaps.[96]  The Class Finder feature of Ingenium 1.0 performed precisely this function.[97]

Finally, limitation 9 of Claim 1 recites "wherein an instructor-led course that allows a learning user to learn as an instructor teaches can be identified for a learning user in view of a need of the learning user."   IPL alleges that the Aspen LMS performs this limitation because:

> For instructor-led courses, Aspen LMS offers "[s]upport for all aspects of blended learning", "Validation and optional enforcement of prerequisite requirements" (Aspen LMS, IPL 009).

> The Aspen LMS provides benefits including, "[m]ap business goals to departmental and individual objectives", "[a]ssess organizational and employee needs against objectives", "[d]evelop and implement plans to bridge assessed gaps", and "[d]eliver and manage a blended learning program" (Aspen LMS, IPL 009)."[98]

Just as IPL accuses Aspen, Ingenium 1.0 provided validation and optional enforcement of pre-requisite requirements.[99]  Ingenium updated the prerequisite field to reflect whether a student had completed the required pre-requisite course.[100]  In addition, Ingenium 1.0 delivered a learning program that mapped business goals and organizational needs against individual objectives and skill requirements.[101]  Ingenium 1.0 had the same functionality that IPL accuses in the Aspen LMS.[102]

These three exemplary independent claims – Claim 1 of the '448 Patent, Claim 53 of the '556 Patent, and Claim 1 of the '478 Patent – illustrate that the Ingenium system performed 41 of 44 claim limitations in precisely the same way in which the Aspen LMS is now accused of infringing the patents-at-issue.  Moreover, as discussed below, there can be no genuine issue of material fact that the Ingenium system performed the remaining three claim limitations.

---

[95] Federico Decl., Exh. J, Exh. A at 56.

[96] Federico Decl. ¶155.

[97] *Id*.

[98] Federico Decl., Exh. J, Exh. A at 59.

[99] Federico Decl., ¶160.

[100] *Id.*

[101] *Id.*

[102] *Id.*

C.   **INGENIUM PERFORMED THE THREE REMAINING CLAIM LIMITATIONS AS REQUIRED BY IPL'S OWN CLAIM CONSTRUCTION.**

For three of the claim limitations implicated by the present motion ("searching," "web server," and "network"), the Ingenium system performed each of these limitations, albeit in a way that differs from the manner now accused by IPL in the Aspen system. Even so, there is no genuine issue of material fact that the Ingenium system met these limitations and, as such, summary judgment is warranted.

1.   **"searching at least some of the documents to extract more than one documents to be the learning materials"**

Claim 1 of the '448 Patent includes the limitation "searching at least some of the documents to extract more than one documents to be the learning materials."[103] IPL contends that this claim limitation should be construed as: "In an educational method, the phrase means electronically searching at least some of the documents to extract more than one document to be the learning materials."[104]

Ingenium 1.0 could search across any and all fields in a database to identify learning materials: "Ingenium can search for your selections in the current field or any of the fields in the database."[105] Those learning materials included both course materials and the documents associated with those courses, as discussed in §III.D. above. By searching fields in the Ingenium database (such as course name, vendor, or student number) a user could return a sub-selection of course materials and documents from the system that would be the learning materials.[106] Because Ingenium 1.0 electronically searched documents to extract more than one document to be the learning materials, it performed this claim limitation.[107]

---

[103] Claims 40, 43, and 71 of the '478 Patent include similar limitations. Neither party has asked for a construction of any of the "searching" terms in these claims. Because IPL's infringement allegations for these claims rely on the same functionality as its infringement allegation for Claim 1 of the '448 Patent, these limitations should be treated together for purposes of this anticipation analysis.

[104] F8/1/05 Joint Claim Construction and Pre-Hearing Statement per Patent L.R. 4-3, Exhibit A, p. 33-34.

[105] *See* Federico Decl., ¶56.

[106] *Id.*

[107] *See* Federico Decl., ¶55.

SUMTOTAL'S NOTICE OF MOT AND MOT
FOR SUMMARY JUDGMENT OF INVALIDITY          22          CASE NO. C-02-02636 DLJ (BZ)

### 2. "wherein the first computer includes a web server"

Claim 53 of the '556 Patent includes the limitation "wherein the first computer includes a web server." IPL's proposed claim construction for this term is "a program, executed by a computing device, which responds to an incoming TCP connection, such as http, and provides a service to the caller."[108]

Ingenium Messenger allowed bi-directional communication between the user and the database via a TCP connection.[109] In response to a request by the user, Ingenium Messenger could: register for classes, check course pre-requisites, and even check a user's availability before registering the user (i.e., "caller") for a course.[110] Ingenium Messenger worked across an organization's e-mail system as well as the internet.[111]

Because Ingenium Messenger could receive email over a TCP connection and would send a response back to the user over the same connection, the prior art Ingenium system performed this claim limitation as construed by IPL.[112] In addition, Ingenium Messenger included a feature called "Ingenium Page" that created web pages containing course information and allowed users to browse those web pages via a browser, using the http protocol. Ingenium Page provided a service to the caller in that, via a browser, an end user could view course information, register for courses, and launch courses and documents over the Internet or a corporate intranet.[113] The prior art Ingenium system thus performed this claim limitation as now construed by IPL.[114]

### 3. "connected to the first computer through a network"

Claim 53 of the '556 Patent also includes the limitation "wherein the materials accessed can be retrieved by at least one of the users from another computer, which is connected to the first

---

[108] On September 14, 2005, IPL sought to amend its proffered claim construction for "web server." Horton Dep. Tr. (rough) at 3-4. Without conceding that IPL can amend its proposed construction, for purposes of this motion, SumTotal has assumed IPL's most recent claim construction for this term.

[109] See Federico Decl., ¶¶30, 108.

[110] Id.

[111] See Federico Decl., ¶ 29.

[112] See Federico Decl., ¶ 30.

[113] See Federico Decl., ¶ 31.

[114] Id.

computer through a network."[115]  Neither party has requested construction of this claim term.  Yet, there can be no genuine issue of material fact that the prior art Ingenium system – and more particularly, Ingenium Page – performed this claim limitation.

Ingenium Page was released as part of Ingenium Messenger 3.0 in the December 1996/January 1997 timeframe.  Ingenium Page allowed users to register for courses over the Internet as well as a corporate intranet.[116]  Whether using the Internet or a corporate intranet, a user accessed registration materials and enrolled in courses in a networked fashion:  the user from his or her terminal or desktop computer could query the system or submit registration information, which would be transmitted to a database or server that was connected via a network.  The prior art Ingenium system therefore performed this claim limitation.[117]

### D.    INGENIUM WAS ON-SALE AND IN PUBLIC USE MORE THAN ONE YEAR BEFORE THE CRITICAL DATE OF THE '448, '556, AND '478 PATENT CLAIMS.

Ingenium 1.0 shipped to customers in the fourth quarter of 1993.[118]  Ingenium 2.0 shipped to customers in the summer of 1994.[119]  By the middle of 1994, Meliora's customer list included Bausch & Lomb, Inc., Corning Inc., Eastman Kodak Company, General Electric Company, Microsoft Corporation, the US Navy, and Xerox Corporation.[120]  Moreover, by mid-1994, American Cyanamid Company, AT&T, Cigna Dental Health, Eastman Kodak Company, Electronic Data Systems, Hewlett-Packard, Monsanto Company, Northern Telecom, and Xerox Corporation had all used the Ingenium system.[121]

Ingenium 3.0 shipped to customers in October of 1996.[122]  Ingenium Messenger 3.0,

---

[115] Claim 1 of the '478 Patent contains the identical limitation.  Claim 23 of the '478 Patent contains the limitations "one of the computers includes a browser" and "the network includes the internet." Claim 56 of the '478 Patent contains the limitation "wherein the method is implemented in a network environment." Neither party sought claim construction for any of these terms.  Because IPL's infringement allegation for each of these claim limitations relies on the same functionality ("The Aspen LMS is 100% Web-based"), each of these claim limitations should be treated together for purposes of this anticipation analysis.

[116] *See* Federico Decl., ¶88.

[117] *See* Federico Decl., ¶89.

[118] *See* Federico Decl., ¶¶20, 223.

[119] *See* Federico Decl., ¶223.

[120] *See* Federico Decl., ¶224.

[121] *Id.*

[122] *See* Federico Decl., ¶226.

including the Ingenium Page feature, was released by at least January 1997.[123]  By November 1996, there were more than 158 customers for the Ingenium learning management software system.[124]

Because the Ingenium system was offered for sale, sold, and used by customers before July 6, 1997, the Ingenium system was on-sale and in public use more than one year before the "critical date" for the patents-at-issue.

## V.    CONCLUSION

For the foregoing reasons, SumTotal requests:  (1) summary adjudication that 41 claim limitations were identically present in the Ingenium system, and (2) summary adjudication that the three remaining claim limitations were present in the Ingenium system.  Because the Ingenium system was on-sale and in public use more than one year before IPL filed for its patents-at-issue, SumTotal also requests this Court to declare invalid for anticipation the following patent claims:

- •   '448 Patent, Claims 1, 2, 3, 13, 16, and 31;

- •   '556 Patent, Claims 53, 73, 74, 75, 77, 79, and 80;

- •   '478 Patent, Claims 1, 17, 21, 22, 23, 40, 43, 44, 45, 56, 59, 67, 71, and 72.

Dated:  September 16, 2005

DAY CASEBEER
MADRID & BATCHELDER LLP


By: _____/s/_____
         Deborah E. Fishman

---

[123] *See* Federico Decl., ¶227.

[124] *Id.*